Filed 3/30/15  United Medical Devices v. PlaySafe CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| UNITED MEDICAL DEVICES, LLC, et al.,<br><br>     Plaintiffs and Respondents,<br><br>     v.<br><br>PLAYSAFE, LLC, et al.,<br><br>     Defendants and Appellants.<br>_____<br><br>PLAYSAFE, LLC, et al.,<br><br>     Plaintiffs and Appellants,<br><br>     v.<br><br>UNITED MEDICAL DEVICES, LLC, et al.,<br><br>     Defendants and Respondents. | B250305 c/w B255537<br><br>(Los Angeles County<br>Super. Ct. Nos. SC113081 c/w<br>SC113149)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Good cause appearing, the opinion in the above entitled matter, filed on March 2, 2015, Not for Publication, is hereby modified as follows:

On page 26, the last sentence of the last paragraph ending "There was no denial of due process." insert as footnote 8 the following:

[8] Hawatmeh and Nora petitioned for rehearing on the ground that the amended judgment naming them as alter egos of PlaySafe is void. They reason that by the time the trial court amended the judgment, they had already filed their first appeal and deprived the court of fundamental jurisdiction. (Code Civ. Proc., § 916, subd. (a) ["the perfecting of an appeal stays proceedings in the trial court upon the judgment . . . ."].) However, as Hawatmeh and Nora acknowledge, no undertaking was filed in the first appeal and so that appeal did not stay enforcement of the judgment. (Code Civ. Proc, § 917.1, subd. (a)(1).) Also, the trial court "may proceed upon any other matter embraced in the action and not affected by the judgment" (Code Civ. Proc., § 916, subd. (a); *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189) and enforcement of the money judgment here is not affected by the judgment. The trial court has the power to amend its judgment at any time, even after judgment, to properly designate the real defendants. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1074-1075.) " 'Amendment of a judgment to add an alter ego "is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant." ' " (*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554-1555; accord, *Agricultural Labor Relations Bd. v. Superior Court* (1993) 15 Cal.App.4th 749, 752.) The trial court had jurisdiction here to amend the judgment to name the alter egos as a matter of enforcement. (Code Civ. Proc., § 917.1, subd. (a)(1); see *Oyakawa v. Gillett* (1992) 8 Cal.App.4th 628, 630-631, fn. 2 [dicta].)

The petition for rehearing is denied.

There is no change in the judgment.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| UNITED MEDICAL DEVICES, LLC, et al., Plaintiffs and Respondents, v. PLAYSAFE, LLC, et al., Defendants and Appellants. _____ PLAYSAFE, LLC, et al., Plaintiffs and Appellants, v. UNITED MEDICAL DEVICES, LLC, et al., Defendants and Respondents. | B250305 c/w B255537 (Los Angeles County Super. Ct. Nos. SC113081 c/w SC113149) |

CONSOLIDATED APPEALS from a judgment and order of the Superior Court of Los Angeles County, H. Chester Horn, Jr., Judge.  Affirmed.

Dorsey & Whitney, Kent J. Schmidt, Karen Morao, Bryan M. McGarry, and Kimberly Neville for Defendants and Appellants and Plaintiffs and Appellants.

Browne George & Ross, Peter W. Ross, Ira Bibbero and Jonathan L. Gottfried for Plaintiffs and Respondents and Defendants and Respondents United Medical Devices, LLC and Patrick Bertranou.

Michael J. Perry for Plaintiffs and Respondents and Defendants and Respondents United Licensing Group, Inc. and Jimmy Esebag.

———————————————

PlaySafe, LLC (PlaySafe) and its sole managers Iehab Hawatmeh and Fadi Nora appeal a judgment following a jury verdict in favor of United Medical Devices, LLC (UMD) on its contract claim arising from a written contract that UMD made with PlaySafe to distribute Playboy-branded condoms to certain territories worldwide (hereafter, Distribution Agreement). PlaySafe, Hawatmeh, and Nora also sued UMD for breach of the Distribution Agreement, alleging UMD failed to provide licenses to several Middle Eastern countries listed in the Distribution Agreement, committed fraud after the execution of the Distribution Agreement by falsely representing its licensing rights to these Middle Eastern countries, and violated the non-circumvention clause in the Distribution Agreement when it interfered with their contractual and business relations after UMD terminated the Distribution Agreement. The trial court granted UMD's motion for nonsuit on the tortious interference claims, and the jury thereafter unanimously rendered a verdict in favor of UMD, awarding UMD $699,972 in damages. In challenging the judgment, PlaySafe, Hawatmeh, and Nora raise three legal errors, contending the trial court gave two prejudicial instructions on PlaySafe's fraud and contract claims, and erred in granting nonsuit on their tortious interference claims. We conclude there was no prejudicial error requiring reversal.

In a second appeal that we have consolidated with the first, Hawatmeh and Nora challenge a postjudgment order adding them as additional judgment debtors on an alter ego theory. They argue no substantial evidence supports the trial court's alter ego finding. We disagree. Accordingly, we affirm the judgment and postjudgment order.

2

FACTUAL AND PROCEDURAL BACKGROUND

1.      *Facts*

In March and April 2010, UMD and Playboy entered into product license agreements (collectively, Playboy License Agreement) in which Playboy granted UMD the right to use its trademark on condoms. Patrick Bertranou, the former chief executive officer of UMD, met with the Hawatmeh and Nora before the Playboy License Agreement was finalized to discuss the possibility of distributing the Playboy-branded condoms. Hawatmeh and Nora, PlaySafe's sole managers, owned a company that already was distributing an energy drink using the Playboy trademark and appeared to have a distribution network in place. Jimmy Esebag of United Licensing Group, Inc. (ULG) facilitated the meeting.

a.  *Distribution Agreement Includes Certain Middle Eastern Countries*

On April 27, 2010, UMD and PlaySafe entered into the Distribution Agreement (effective date of April 1, 2010) for a five-year term. At the conclusion of the first year, UMD terminated the Distribution Agreement. The claims asserted in this litigation arise from the following provisions in the Distribution Agreement.

(1)      *The Territory and the Middle East Sub-Territory*

The Distribution Agreement authorized PlaySafe to sell condoms in Africa, the Middle East, Eastern Europe, Oceania, and Northern Europe, which were referred to collectively as "the Territory." The sub-territory at issue in this litigation is the Middle East, or "Sub-Territory B," which included Lebanon, Bahrain, Egypt, Iraq, Iran, Jordan, Kuwait, Libya, Oman, Palestine, Qatar, Saudi Arabia, Sudan, Syria, United Arab Emirates, Yemen, and Pakistan (Sub-Territory B).

UMD "warrant[ed] that it has or will have, no later than April 30, 2010, a worldwide licensing agreement with Playboy that is sufficient to grant to Distributor [PlaySafe] the rights and licenses to the full Territory set forth in this Agreement . . . ."

3

(2)    *Minimum Purchase Requirements and Minimum Guaranteed Payments*

The Distribution Agreement required that PlaySafe purchase a minimum of 10 containers of condoms in 180 days after the parties signed the contract, and a minimum guaranteed purchase of at least $6.2 million in condoms in the first year for distribution in the territories covered by the Distribution Agreement. PlaySafe also had to pay a $700,000 royalty fee during the first year of the contract.

(3)    *Non-Circumvention*

To protect its business contacts, PlaySafe demanded that the Distribution Agreement include a non-circumvention clause. UMD agreed that either during or for a period of one year after termination of the Distribution Agreement, it would not "make any contact with, deal with, circumvent, or otherwise become involved in any transaction, whether indirectly, or by parallel agreement or through parties with any person or company in Distributor's [PlaySafe's] distribution chain under this Agreement, without the prior written permission of the Distributor [PlaySafe]."

(4)    *Distributor's Responsibilities*

The Distribution Agreement required that PlaySafe obtain "any necessary import licenses or other requisite documents and pay[] all applicable customs duties and taxes in respect of the importation of Products into the Territory and their resale in the Territory."

b. *Playboy Does Not Authorize the Use of its Trademark in Certain Middle Eastern Countries Listed in the Distribution Agreement*

As of April 2, 2010, PlaySafe knew that Playboy had not authorized UMD to use its trademark in all the countries listed in the Distribution Agreement. Hawatmeh had received a draft of the Playboy License Agreement that did not include Iraq, Iran, Syria, Libya, Saudi Arabia, Albania, Oman, Sudan, Czech Republic, Kuwait, and the United Arab Emirates, which were countries listed in the Distribution Agreement. The warranty provision in the Distribution Agreement gave UMD until April 30, 2010 to obtain authorization from Playboy for the use of its trademark in these countries.

4

(1)    *May 6 E-mail from Playboy to UMD*

On May 6, 2010, Playboy informed UMD that "[d]ue to extensive sanctions," it could not authorize the use of its trademark in Syria and Iran, and that Sudan remained a concern. PlaySafe immediately was informed that Playboy would not authorize the use of its trademark in several Middle Eastern countries listed in Sub-Territory B, including Syria, Sudan, Saudi Arabia, Libya, Iran, and Iraq.[1] PlaySafe did not withdraw from the Distribution Agreement upon learning that these countries were no longer available markets for distributing Playboy-branded condoms.

(2)    *May 7 Authorization Letter from UMD to PlaySafe*

Because the terms of the Distribution Agreement were confidential, PlaySafe sought and obtained an authorization letter on UMD letterhead to show potential sub-distributors that it was authorized to distribute Playboy-branded condoms. On May 7, 2010, at PlaySafe's request, UMD sent a letter stating that UMD had been appointed as an authorized licensee of Playboy, and in turn, UMD had appointed PlaySafe as its authorized distributor (the authorization letter). The authorization letter listed all the countries in Sub-Territory B, as set forth in the Distribution Agreement, including Syria, Sudan, Saudi Arabia, Libya, Iran, and Iraq, even though Playboy had informed UMD that it would not authorize the use of its trademark in several of these countries.

c. *PlaySafe Failed to Meet the Minimum Purchase Requirement*

PlaySafe did not meet the minimum purchase requirement under the Distribution Agreement. Toward the end of the first year, no product had been delivered, and PlaySafe had not sold any condoms. PlaySafe also had not obtained a single legal authorization to sell condoms in any of the countries listed in the Distribution Agreement.

---

[1]    The jury heard conflicting testimony on this point. Hawatmeh testified that he was not informed, and he did not see the May 6 e-mail until a much later date.

5

After efforts to modify the Distribution Agreement failed, UMD terminated the Distribution Agreement with PlaySafe. Any sub-distribution agreement PlaySafe had with its distributors also terminated based upon an express clause in that contract.

d. *UMD Contacts Sub-Distributors After Terminating the Distribution Agreement*

At the time the Distribution Agreement was terminated, PlaySafe had entered into sub-distribution agreements with several distributors, including companies named "Play With Me" and "Quick Drinks." UMD contacted these sub-distributors.[2]

Additional facts will be presented when necessary to resolve the claims of error raised on appeal.

2. *Proceedings*

a. *Pleadings*

UMD filed a complaint against PlaySafe, Hawatmeh, and Nora alleging breach of contract and fraud.

PlaySafe, Hawatmeh, and Nora filed a complaint against UMD, Bertranou, ULG, and Esebag. The operative second amended complaint (complaint) alleged causes of action on behalf of PlaySafe against UMD for breach of contract, breach of the covenant of good faith and fair dealing, and also sought declaratory relief. All the plaintiffs (PlaySafe, Hawatmeh, and Nora) alleged causes of action against all of the defendants for tortious interference with contract, tortious interference with prospective business relationship, misappropriation of trade secrets, and injunctive relief. The fraud and

---

[2]    UMD also contacted a company called "Hellada," a sub-distributor in Russia. It is unclear from the record whether PlaySafe had entered into a sub-distribution agreement to distribute Playboy-branded condoms in Russia. Hawatmeh testified that PlaySafe entered into a sub-distribution agreement with KH International, and Skytex was its local distributor in Russia. It is also unclear from the record whether UMD ever contacted KH International, as the record citation in PlaySafe's brief does not support that fact. Nevertheless, there is no mention of any relationship between Hellada and PlaySafe. Bertranou testified that PlaySafe did not do business with Hellada. Moreover, UMD entered into a distribution agreement with Hellada on July 1, 2012, more than one year after the termination of the Distribution Agreement.

6

negligent misrepresentation claims were brought on behalf of PlaySafe against all the defendants.

PlaySafe's contract claims against UMD alleged that it had performed under the Distribution Agreement, and UMD breached the contract when it (1) failed to procure the rights to use the Playboy trademark in all of the Middle Eastern countries listed in Sub-Territory B, (2) contacted and entered into agreements with PlaySafe's sub-distributors, and (3) repudiated or terminated the Distribution Agreement.

PlaySafe's intentional and negligent misrepresentation claims alleged that in order to induce PlaySafe to enter into the Distribution Agreement, and to continue to perform, UMD and others represented that (1) it had procured a worldwide licensing agreement to grant PlaySafe the rights to the full territory listed in the Distribution Agreement; (2) it would grant an exclusive distributorship to the full territory listed in the Distribution Agreement; and (3) it would not circumvent PlaySafe's rights by contacting its sub-distributors. Additionally, these fraud claims were based upon both the oral representations that UMD had, or would have obtained, authorization from Playboy to use its trademark in the full territory listed in the Distribution Agreement, and the written representations in the authorization letter.

The tortious interference claims were based upon allegations that UMD and others attempted to contact PlaySafe's sub-distributors after the Distribution Agreement was terminated.

b. *Trial, Nonsuit, Appeal from the Judgment*

The cases were consolidated for trial. After an eight-day jury trial, the jury returned a unanimous special verdict in favor of UMD on its contract claim. By special verdict, the jury unanimously found against PlaySafe. Before the case was argued to the jury, the trial court granted nonsuit on the tortious interference claims.

PlaySafe, Hawatmeh, and Nora filed a timely notice of appeal from the judgment in favor of UMD in Case No. B250305. While the appeal was pending, the trial court amended the judgment to add attorney fees and costs.

7

c. *Postjudgment Order Adding Hawatmeh and Nora, Appeal*

While the appeal from the judgment was pending, UMD moved to add Hawatmeh and Nora as additional judgment debtors of PlaySafe. The trial court granted the motion, and they timely filed a notice of appeal in Case No. B255537.

We consolidated the appeals for oral argument and disposition. In Part I, we address the claims of error arising from the judgment. In Part II, we address the challenge to the postjudgment order amending the judgment.

DISCUSSION

I. *Appeal from the Judgment*

PlaySafe, Hawatmeh, and Nora present three claims of legal error. The first two are instructional errors. They contend the trial court (1) erroneously instructed the jury that PlaySafe's fraud causes of action could not be based upon any misrepresentations occurring after the Distribution Agreement was executed, and (2) erred in instructing the jury on the "fact" that the United States government imposed export sanctions on the sale of Playboy-branded condoms to Iran, Syria, and Sudan. The third claim of error arises from the trial court's order granting nonsuit on their tortious interference claims.

1. *Standards of Review*

We review de novo whether a challenged jury instruction correctly states the law. (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 298.) When deciding whether an erroneous jury instruction was prejudicial, we evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury that it was misled. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581.) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Id.* at p. 580.)

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most

8

favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit. [Citation.]" (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541.) Because motions for nonsuit raise issues of law, we independently review the trial court's ruling granting the motion, employing the same standard that governs the trial court. (*Nally v. Grace Community Church*, *supra*, at p. 291.)

2.      *PlaySafe Has Not Shown Prejudicial Error Arising from the Fraud Instruction*

PlaySafe contends prejudicial error occurred when the trial court gave a special instruction that prohibited the jury from considering misrepresentations that occurred after the parties executed the Distribution Agreement.[3] Special Instruction No. 78 states: "PlaySafe's claims for intentional and negligent misrepresentation may not be based on alleged misrepresentations or concealments that occurred after the Distribution Agreement was signed between United Medical Devices and Play[S]afe. A party to a contract may not be defrauded into complying with its preexisting contractual obligations" (Special Instruction No. 78). The effect of Special Instruction No. 78 was to foreclose the jurors from considering the May 6 e-mail from Playboy to UMD and the authorization letter (dated May 7) as evidence to support PlaySafe's fraud claims.

---

[3]      Generally, " ' "[t]he elements of fraud, which gives rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' [Citation.]" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.) The elements of negligent misrepresentation are: " '[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage. [Citation.]' [Citation.]" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.)

9

a. *Overview of Fraud Claims in the Context of Commercial Contracts*

"As a general rule, California law does not authorize the award of general or punitive damages for breach of a commercial contract." (*Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 77; see also *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550-551 [contract actions enforce the intentions of the parties to the agreement while tort law primarily vindicates social policy].) Restrictions on contract remedies protect "the parties' freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise." (*Harris v. Atlantic Richfield Co.*, *supra*, at p. 77.)

Relying on *Harris v. Atlantic Richfield Co.*, *supra*, 14 Cal.App.4th 70, PlaySafe contends that California law recognizes a cause of action for fraud based on events occurring after the formation of a contract. The *Harris* court cited to *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154 for the proposition that "when one party commits a fraud during the contract formation or performance, the injured party may recover in contract and tort." (*Harris v. Atlantic Richfield Co.*, at p. 78.) The citation to *Godfrey* is not pertinent to the *Harris* court's holding as none of the exceptions to impose tort liability for essentially a contract claim applied in that case, and the court declined to create a new exception. (*Id.* at pp. 78-82.) Since *Harris* was decided, the California Supreme Court has clarified and addressed exceptions to the general rule limiting contract remedies.

" '[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. [Citation.]' [Citation.]" (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 989 (*Robinson Helicopter*); *Erlich v. Menezes*, *supra*, 21 Cal.4th at p. 551.) "Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.] In each of these cases, the duty that gives rise to tort liability is either completely independent of the

10

contract or arises from conduct which is both intentional and intended to harm. [Citation.]" (*Erlich v. Menezes*, *supra*, at pp. 551-552.) The failure to perform a contractual obligation is never a tort. (*Id*. at p. 551.)

Quoting *Robinson Helicopter*, PlaySafe asserts that "[p]ost-contractual fraud is actionable because 'a contract is not a license allowing one party to cheat or defraud the other.' " This quotation is cited out of context and distorts the narrow holding in *Robinson Helicopter*.

In *Robinson Helicopter*, a contractor supplied components for its helicopters that did not comply with precise specifications approved by the Federal Aviation Administration (FAA). (*Robinson Helicopter*, *supra*, 34 Cal.4th at pp. 985-986.) The contract obligated the contractor to supply Robinson Helicopter with components that conformed to these precise specifications. (*Ibid*.) The contractor, nevertheless, provided intentionally false conformance certificates when it supplied these components. (*Id*. at p. 986.) Robinson Helicopter had to recall the affected helicopters with these components and explain the situation to federal and foreign regulators. (*Id*. at pp. 986-987.)

The *Robinson Helicopter* court held the knowingly false certificates were fraudulent misrepresentations independent of the contractor's contractual duty. (*Robinson Helicopter*, *supra*, 34 Cal.4th at pp. 990-991.) Specifically, providing the nonconforming components breached the contract, but providing knowingly false certificates was "independent fraudulent conduct" that breached an independent tort duty. (*Id*. at p. 991.) The *Robinson Helicopter* court, however, did not rest its exception solely on extraneous fraud in the false certificates: "Our holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and* which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." (*Id*. at p. 993, italics added.) Thus, *Robinson Helicopter* is limited to those circumstances when the tortious conduct is both separate from the breach of contract and caused damages independent of the contractual breach. (*Id*. at pp. 989-991.) In these narrow circumstances, the *Robinson Helicopter* court recognized a cause of

11

action for fraud based on events that occurred after contract formation.  (*Id.* at p. 991.)
No such cause of action was alleged here, and therefore any reliance on *Robinson
Helicopter* is misplaced.

Here, the intentional and negligent misrepresentation claims were based, in part,
upon the authorization letter dated *after* the April 30 deadline in the Distribution
Agreement and *after* UMD had been informed that Playboy would not authorize the use
of its trademark in several Middle Eastern countries listed in the Distribution Agreement.
The authorization letter suggests no misrepresentation "beyond a broken contractual
promise."  Moreover, PlaySafe has no damages independent of the contractual breach.

We reject PlaySafe's contention that the representations in the authorization letter
constitute an independent tort because these representations were not collateral to the
contract.  The misrepresentations were not " 'conceptually distinct' " from those set forth
in the Distribution Agreement, which lists these Middle Eastern countries as part of Sub-
Territory B, and sets forth the deadline to obtain authorization.  Such representations
might have given rise to fraudulent inducement, for which the jury was instructed, but do
not fall within any other exception or circumstances identified by the California Supreme
Court that allows a contract based cause of action to be pursued as a tort claim.  Thus,
PlaySafe did not fall within an exception to the general rule to recover tort damages on
what is essentially another contract claim.

PlaySafe's reliance on *Hartung v. Pollastrini* (1956) 147 Cal.App.2d 88, and
*Wetherbee v. United Insurance Co. of America* (1968) 265 Cal.App.2d 921, is misplaced.
In *Hartung*, the issue was whether the plaintiff had waived the contractual breach by
relying on the defendant's false promises to perform.  (*Hartung v. Pollastrini*, *supra*, at
pp. 91-92.)  *Wetherbee* was a fraudulent inducement case in which the plaintiff was
awarded punitive damages by proving the insurance company made misrepresentations
after the issuance of an insurance policy that induced the plaintiff not to cancel the policy

and to thereafter obtain a second policy. (*Wetherbee v. United Insurance Co. of America*, *supra*, at pp. 924, 928-931.)[4]

  b. *No Prejudicial Error*

  Here, our review of the record leads to the conclusion that, even if the trial court did err in giving Special Instruction No. 78, it does not seem probable that giving this instruction prejudicially affected the verdict. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.) The jury considered the May 6 e-mail and the authorization letter in determining the contract claims asserted by PlaySafe against UMD, which included whether PlaySafe was fraudulently induced to enter into the Distribution Agreement.

  The jury heard evidence that PlaySafe knew as of April 27 when it signed the Distribution Agreement that UMD had not obtained authorization for all the countries listed in Sub-Territory B, and that UMD did not meet its contract deadline to obtain authorizations by April 30. The jury also heard that Playboy would not authorize the use of its trademark in certain Middle Eastern countries but, after obtaining this information, PlaySafe did not terminate the Distribution Agreement.

---

[4] PlaySafe omits any reference to fraudulent inducement in its recitation of the *Wetherbee* facts. As the *Wetherbee* court states: "Plaintiff's complaint states that as a result of defendant's representation, plaintiff was induced not to cancel her first insurance policy and to purchase a second in the belief that they entitled her to benefits which defendant in fact had no intention of paying." (*Wetherbee v. United Insurance Co. of America*, *supra*, 265 Cal.App.2d at p. 930.) To defend her punitive damages award, Wetherbee relied on the rule of law "that such damages are recoverable in a tort action, based upon the plaintiff's having been fraudulently induced to enter into a particular contract, even though the tort incidentally involves a breach of contract. [Citations.]" (*Id.* at p. 928.) We likewise find inapposite *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, also cited by PlaySafe, which addressed whether a successor was liable for fraud in connection with loan modifications and held that triable issues of fact existed as to whether the successor also made misrepresentations in connection with the loan modification. (*Id.* at pp. 892-895.)

The jury concluded that UMD did not breach the Distribution Agreement, necessarily finding that PlaySafe must have waived any breach by UMD in failing to obtain these authorizations.[5]  The tortious conduct giving rise to PlaySafe's fraud claims after it executed the Distribution Agreement is based upon representations in the authorization letter that repeated the terms of the Distribution Agreement.  Having found against PlaySafe on the contract claim, it is not reasonably probable the jury would have concluded that repeating these contract terms in the authorization letter constituted independent fraud.  Considering the state of the evidence and the other instructions, the record does not indicate the jury was misled by Special Instruction No. 78.  (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876.)  Accordingly, we conclude there was no miscarriage of justice that warrants reversal.  (Cal. Const., art. VI, § 13; *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.)

3.    *PlaySafe Has Not Shown Prejudicial Error Arising from the Sanctions Instruction*

PlaySafe next contends the trial court committed prejudicial error in granting UMD's request to take judicial notice of federal laws and regulations from which it concluded that federal law prohibited the export of condoms to Iran, Sudan, and Syria, and thereafter instructed the jury.  Even if the trial court reached the wrong legal conclusion, we conclude there was no prejudicial error.

a.  *Background Facts*

The trial court took judicial notice that the United States government had imposed widespread sanctions against the exportation, reexportation, sale, or supply of any goods, technology, or services to Iran, Sudan, and Syria.  (Exec. Order No. 13059, 62 Fed.Reg. 44531 (Aug. 21, 1997); Exec. Order No. 13067, 62 Fed.Reg. 59989 (Nov. 5, 1997); Exec. Order No. 13338, 69 Fed.Reg. 26751 (May 13, 2004).)  The sanctions against Iran and

---

[5]    In arguing prejudicial error, PlaySafe states this instruction prohibited it from asserting its fraud defense to UMD's contract claim.  The instruction refers only to PlaySafe's intentional and negligent misrepresentation claims, not its contract defenses.  "We presume that the jury followed the instructions it was given [citation] . . . ."  (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 364.)

14

Sudan are subject to export exceptions, which include "medical devices," pursuant to a one-year license issued by a U.S. government agency. (See 31 C.F.R. §§ 538.523, 31 C.F.R. § 560.530 (2010).) Medical devices are defined in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.). (21 U.S.C. § 321(h).) The Bureau of Industry and Security (BIS) promulgates Export Administration Regulations (EAR) and publishes an illustrative list of medical devices that are classified as "EAR99" for which license applications to export to Iran and Sudan may be submitted. Condoms do not appear on the illustrative list. As for Syria, Executive Order No. 13338 includes a provision permitting the BIS to grant licenses for medical devices. (Exec. Order No. 13338, 69 Fed.Reg. 26753 (May 13, 2004).)

The trial court concluded that condoms are not medical devices and directed the parties to prepare a jury instruction based upon that ruling. The trial court instructed the jury as follows: "The Court has determined that from at least January 1, 2010 to the present the United States government has prohibited the sale of Playboy branded condoms to Iran, Syria, and the Sudan." (Sanctions Instruction).

b. *No Prejudicial Error*

PlaySafe contends the Sanctions Instruction was prejudicial because the trial court's legal conclusion was faulty as it relied on the illustrative list to conclude that condoms were not the type of medical device that could have been exported with the proper license, or that a license to export condoms would have been denied had an application been presented to the appropriate agency. As previously stated, in a civil action erroneous jury instructions are not inherently prejudicial. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.)

Appellants argue two points to show prejudice: (1) the instruction "discounted the materiality of [UMD's] false statements" regarding its authorization to sell Playboy-branded condoms in Iran, Syria, and Sudan; and (2) the evidence established that it had performed under the Distribution Agreement and entered into sub-distribution agreements to sell Playboy-branded condoms, and could have sold the product in these

15

countries.[6] Neither of these points establishes the reasonable probability that a different outcome would have occurred absent the Sanctions Instruction.

Independent of any sanctions, license applications to export, or lack of authorizations to use the Playboy trademark, the jury heard that PlaySafe had not obtained legal authorization from the governments of Iran, Syria, and Sudan to sell condoms in those countries. Thus, no evidence was presented at trial that PlaySafe actually could have sold condoms in Iran, Syria, and Sudan had either Playboy or UMD applied for and obtained a license to export condoms. Accordingly, based upon the *Soule* factors, we conclude the result would have been the same even if the Sanctions Instruction had not been given, and therefore there was no miscarriage of justice. (Cal. Const., art. VI, § 13; *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.)

4.     *The Trial Court Did Not Err in Granting Nonsuit on the Interference Claims*

Appellants (PlaySafe, Hawatmeh, and Nora) contend sufficient evidence was presented at trial to establish each element of their claims for tortious interference with contractual relations and interference with prospective business relationship. We reject this contention. As shall be discussed, no valid contractual relationship existed (first element) for purposes of interference with contractual relations. Moreover, no economic relationship existed between PlaySafe, Hawatmeh, and Nora and a third party with the probability of future economic benefit (first element) for which they suffered economic harm (fourth element) for purposes of a claim for interference with prospective business relationship.

---

[6]     UMD submitted in its respondent's appendix the sub-distribution agreement that PlaySafe entered into with MSA Offshore S.A.I., which listed Iran and Sudan, and was dated November 12, 2011, several months after the Distribution Agreement was terminated. Hawatmeh testified the date was incorrect and should have read "November 12, 2010," and also should have included Syria.

16

a. *Elements of Tortious Interference Claims*

The intentional interference claims were based upon improper contact with sub-distributors in violation of the non-circumvention provision in the Distribution Agreement. Wrongful interference with contractual relations requires " '(1) a valid contract between plaintiff [PlaySafe] and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.)

Interference with a prospective business relationship is much broader and "protects against intentional acts designed to harm an economic relationship [that] is *likely* to produce economic benefit." (*Shamblin v. Berge* (1985) 166 Cal.App.3d 118, 123.) The elements of such a claim are: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citation.]' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.) As to the third element, the defendant must engage in an act that is wrongful apart from the interference itself. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393.) The plaintiff, however, need not prove that "the defendant engaged in wrongful acts *with the specific intent* of interfering with the plaintiff's business expectancy." (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, at p. 1154.)

b. *No Evidence to Establish the Existence of an Enforceable Contract*

PlaySafe did not present sufficient evidence of a valid contract with any of its sub-distributors to satisfy the first element of its tortious interference with contract claim. PlaySafe had entered into several sub-distribution agreements, but these were subordinate to the Distribution Agreement and the Playboy License Agreement.

17

PlaySafe acknowledges that the sub-distribution agreements were unenforceable after UMD terminated the Distribution Agreement, but cites *Zimmerman v. Bank of America* (1961) 191 Cal.App.2d 55, 57-58, for the proposition that unenforceable contracts "qualify as contracts for the purpose of a tortious interference claim." *Zimmerman* blurred the distinction between interference with contractual relations and interference with a prospective business relationship. (See *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 339-340.) As the California Supreme Court stated in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, *supra*, 11 Cal.4th 376, the two torts are analytically distinct. (*Id*. at pp. 392-393.) When there is no existing enforceable contract, a cause of action for tortious interference with contractual relations will not lie. (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 878-879.)

Here, the evidence presented at trial established that upon termination of the Distribution Agreement no enforceable contract existed between PlaySafe and its sub-distributors. At that point, neither PlaySafe nor its sub-distributors had any right to use the Playboy trademark to sell condoms. Thus, there was no evidence to establish the first element of a claim for interference with contractual relations. Accordingly, the trial court did not err in granting the motion for nonsuit.

c. *No Evidence of an Economic Relationship with a Future Benefit or Economic Harm*

PlaySafe did not present evidence of an economic relationship with the probability of future economic benefit or, any resulting economic harm. PlaySafe acknowledged that after termination of the Distribution Agreement, it had no replacement condom brand to offer its sub-distributors. Moreover, to the extent PlaySafe suffered any damages, these damages were no different than the damages it sought for breach of the Distribution Agreement.[7] A party to a contract cannot recover tort damages for breach of contract.

---

[7] PlaySafe's proposed jury instruction for breach of contract stated: "PlaySafe claims that UMD breached this contract by: [¶] . . . [¶] . . . Contacting PlaySafe's sub-

(See *Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 618.) Accordingly, the trial court did not err in granting the motion for nonsuit.

## II. *Appeal From the Postjudgment Order*

Hawatmeh and Nora contend the trial court erred in amending the judgment to add them as additional judgment debtors on an alter ego theory. They argue the order should be reversed because there is insufficient evidence to disregard the corporate form. We disagree.

1.      *Motion to Add Additional Judgment Debtors*

" 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*Millikan v. American Spectrum Real Estate Services Cal., Inc.* (2004) 117 Cal.App.4th 1094, 1105, citing *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) Keeping this standard in mind, we summarize the evidence before the trial court on the motion to amend the judgment.

a.      *Facts*

PlaySafe is a Utah limited liability company that was formed in March 2010 for the purpose of marketing Playboy-branded condoms. Hawatmeh and Nora are the sole managers of PlaySafe, and together they own 75 percent of the company. Aziz Nassour has a 25 percent interest. The PlaySafe operating agreement states that the managers, Hawatmeh and Nora, "shall be solely responsible for the management of the Company's business and activities . . . . [A] majority vote of the [m]anagers with each [m]anager getting one vote, shall control."

---

distributors for the purpose of offering and entering into an agreement directly with them for the Playboy-branded condoms, without PlaySafe's knowledge or consent . . . ."

19

Under the terms of its Distribution Agreement, PlaySafe had to pay a $700,000 royalty fee during the first year of the contract to obtain the exclusive right to use the Playboy trademark on its condoms. Additionally, PlaySafe had a minimum purchase requirement during the first year of the Distribution Agreement. Nassour loaned PlaySafe $500,000, and Nora invested $100,000 on his behalf and another $100,000 on behalf of Hawatmeh. In September 2010, PlaySafe made an initial $200,000 license fee payment to UMD.

From July 21, 2010 through August 19, 2011, Hawatmeh and Nora received $1,167,975 in loans from PlaySafe. These loans were not documented by promissory notes and, at Hawatmeh's and Nora's direction, bear no interest.

Hawatmeh and Nora were owed a salary, but they did not draw their salaries during the early stages of the company. By December 31, 2011, they had accrued $240,000 in unpaid salaries. Instead of taking the accrued salaries, they each borrowed $100,000 from PlaySafe. Nassour approved the loans.

b.     *Trial Court's Written Order Granting the Motion*

In granting the motion, the trial court concluded that "the evidence that Hawatmeh and Nora abused the corporate structure of [PlaySafe] to, in effect, operate it as their personal bank account is overwhelming. They effectively looted the corporation by taking out more than $1 million in loans over a 13 month period rendering Play[S]afe effectively insolvent. Indeed, Play[S]afe had only been capitalized with a total of $700,000. The suggestion that these loans were approved by 'independent directors' is belied completely by the evidence."

2.     *Governing Alter Ego Theory Legal Principles*

Code of Civil Procedure section 187 permits a trial court to add a person as a judgment debtor who is found to be the alter ego of the corporate defendant. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1068-1069, 1072-1073.) " 'Judgments may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor. . . . "Amendment of a judgment to add an alter ego 'is an equitable procedure based on the theory that the court is not amending the

20

judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . . "Such a procedure is an appropriate and complete method by which to bind new . . . defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit." ' " ' [Citations.]" (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*).) " ' "The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done." ' [Citation.]" (*Ibid.*)

There is no "litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).) There are "two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' [Citation.]" (*Ibid.*; see also *Greenspan*, *supra*, 191 Cal.App.4th at p. 511.) If these two criteria are met, it must also be shown that the additional judgment debtor controlled the litigation and thus was virtually represented in the proceeding. (*Greenspan*, *supra*, at p. 508.) " 'Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence.' " (*Id.* at p. 512.)

Before addressing the merits, we agree with UMD that Hawatmeh and Nora have forfeited any challenge to the trial court's order by failing to set forth all the material evidence on the point. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; see also *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34 ["[A]s with any challenge to the sufficiency of the evidence, it is the appellant's burden to set forth not just the facts in its favor, but all material evidence on the point."].) Nevertheless, even if they had not forfeited this issue, there is substantial evidence in the record to support the trial court's order.

21

3.    *Substantial Evidence Supports the Trial Court's Order Amending the Judgment*

Hawatmeh and Nora advance their appeal by pointing to favorable and contradictory evidence that supports their position. In assessing whether any substantial evidence exists, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the trial court's order if there is evidence to support it. (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 916; see also *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) If there is substantial evidence, no matter the presence of contradictory evidence, the order must be upheld. (*Morgan v. Imperial Irrigation Dist.*, *supra*, at p. 917.) Here, the trial court concluded there was "overwhelming evidence" that Hawatmeh and Nora abused the corporate form.

a. *Substantial Evidence of Unity of Interest*

Hawatmeh and Nora contend that there is no unity of interest between them and PlaySafe because PlaySafe is properly organized as a limited liability company and was adequately capitalized to pay its initial royalty fee to UMD. This argument ignores the substantial contrary evidence.

Whether there is sufficient unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist encompasses a number of factors. (See *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811-812 (*Zoran*) [listing 14 factors].) Among the many factors to be considered in applying the alter ego doctrine are the unauthorized diversion of corporate funds or assets to other than corporate use; the treatment by an individual of the assets of the corporation as his own; the failure to maintain minutes or adequate corporate records; the use of the same office or business location, the same employees, and/or the same attorney; absence of corporate assets and inadequate capitalization; the disregard of legal formalities; and the diversion of corporate assets to another person or entity. This list is not exhaustive, and these factors may be considered with others under the particular circumstances of each case. " 'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the [alter ego] doctrine.' " (*Id*. at p. 812.)

22

According to their own expert, Hawatmeh and Nora treated PlaySafe's assets as their own, obtaining more than $1 million in interest-free loans from the company. Neither Hawatmeh nor Nora executed a promissory note for any of the funds they borrowed. While Hawatmeh and Nora maintain they were owed $240,000 in unpaid salary as of December 31, 2011, sizeable loans were made before PlaySafe incurred this debt. In November 2010, for example, Nora obtained a $150,000 loan, just eight months after the company was formed. Nassour, the minority owner, testified that in 2010 he approved loans of $100,000 in lieu of salary, but $462,000 in interest-free loans were made from PlaySafe to Hawatmeh and Nora during that year. Hawatmeh and Nora also presented declarations attesting that $600,000 of the loans recorded on the books as made to them actually went to another company they owned, but even if this were so, there remained $467,975 in loans from PlaySafe to them.

Moreover, PlaySafe's operating account was depleted by these loans, and was inadequately capitalized in the first instance, as $500,000 of the initial $700,000 was a loan. This initial capital contribution was sufficient to pay the royalty fee for the first year of the Distribution Agreement, but it was not sufficient to meet its obligations under the Distribution Agreement that required a guaranteed minimum purchase during the first year of the contract.

Based on the foregoing, the trial court was presented with substantial evidence of numerous factors set out in *Zoran*, *supra*, 185 Cal.App.4th 799, that is, Hawatmeh and Nora treated PlaySafe's assets as their own, failed to keep adequate corporate records, dominated PlaySafe, disregarded legal formalities, diverted PlaySafe's assets, and inadequately capitalized PlaySafe. This evidence supports the conclusion that there was sufficient unity of interest and ownership that the separate personalities of the individuals, Hawatmeh and Nora, and the company, PlaySafe, did not exist.

b. *Substantial Evidence of Inequitable Result*

Hawatmeh and Nora next contend that UMD's motion was premised upon the inability to collect on the judgment against PlaySafe, which does not satisfy the second requirement of the alter ego doctrine. Rather, this requirement is satisfied only if there is

23

a finding that treating the acts as those of the company alone will sanction a fraud, promote injustice, or cause an inequitable result. Citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*), they contend that to satisfy this second requirement, there must be a finding of subjective bad faith. Insofar as the *Sonora Diamond* court addressed this issue, it did so when determining whether an inequitable result or injustice would occur if recognizing the separate corporate entity.

In *Sonora Diamond*, *supra*, 83 Cal.App.4th 523, the court rejected a claim to pierce the corporate veil because there was no "evidence of any wrongdoing by either Diamond [the parent company] or Sonora Mining [the wholly owned subsidiary of Diamond] or any evidence of injustice flowing from the recognition of Sonora Mining's separate corporate identity." (*Id*. at p. 539.) The *Sonora Diamond* court acknowledged that "[t]he alter ego doctrine . . . affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form" (*ibid*.), but it did not hold that there must be a finding of "bad faith" to satisfy this element.

Because imposition of alter ego liability is based upon equitable principles, courts frequently look to evidence of fraud or "bad faith" to assess whether individual liability is warranted. The alter ego doctrine, however, does not depend upon pleading or proving fraud (*Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1074), bad faith, or wrongful intent (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 816), rather it applies if recognizing the entity's existence would promote injustice or bring about an inequitable result (*Misik v. D'Arco*, *supra*, at p. 1074). When a party seeks the benefits of the corporate form but ignores the corresponding burdens in a manner that prejudices a third party, an unjust or inequitable result may be found regardless of wrongful intent.

We also reject the contention that the trial court committed legal error because the alter ego analysis differs in contract cases. To support this contention, Hawatmeh and Nora rely on federal cases stating the corporate veil is less likely to be pierced because the parties have chosen to conduct business and have some ability to guarantee against

24

loss. (See, e.g., *Cambridge Electronics Corp. v. MGA Electronics* (C.D.Cal. 2004) 227 F.R.D. 313, 330-331, fn. 50; *Cascade Energy and Metals Corp.* (10th Cir. 1990) 896 F.2d 1557, 1577 (*Cascade Energy*).) *Cambridge Electronics* relied on *Cascade Energy*, which applied Utah law and stated in dicta that California law does not appear to be materially different than Utah's law. (*Cascade Energy*, at pp. 1575-1576, fn. 18.) This reference was to the two elements that must exist before a corporate entity may be disregarded, not the proposition appellants advance. Moreover, the California cases cited by the *Cascade Energy* court, *Automotriz etc. De California v. Resnick* (1957) 47 Cal.2d 792, 796-798, and *Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 119-120, do not hold that the alter ego analysis differs in contract cases.

Under California law, a "claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance, but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." (*Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1359.)

Here, substantial evidence supports the trial court's implied finding of an inequitable result. The court concluded that Hawatmeh and Nora "abused the corporate structure of Play[S]afe to, in effect, operate it as their personal bank." We construe the court's statement as they shirked the burdens of the corporate form. Diversion of corporate assets, loans far exceeding the amount approved, and undercapitalization, rendered PlaySafe insolvent and unfairly prejudiced UMD to satisfy its judgment. We already have concluded that the court's findings of these factors were supported by substantial evidence.

    c. *Control of the Litigation*

Although the trial court's minute order does not address the final requirement of the test, that is, the alter ego of the corporate entity had control of the litigation and was

25

virtually represented in the lawsuit, on appeal, all intendments and presumptions are indulged in favor of its correctness and ambiguities are resolved in favor of affirmance. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286.) Hawatmeh and Nora contend that while they were present at trial, they were not virtually represented in defending against UMD's breach of contract claim because they had no personal interest at stake. This is not the test. The final requirement is satisfied if it can be shown that the alter ego of the corporate entity had control of the litigation and was virtually represented in the lawsuit. (*Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1075.)

Employing the proper standard, substantial evidence supports the final requirement. Hawatmeh and Nora were parties to the litigation, present at the counsel's table throughout the trial, represented by PlaySafe's counsel at their depositions and during cross-examination at trial. Hawatmeh and Nora are the sole managers of PlaySafe. Who else would have had control over the defense of UMD's contract claims and the prosecution of PlaySafe's contract claims against UMD? This is not the case in which the interests of PlaySafe in the contractual dispute were different from those of the alter egos. Moreover, the same judge that ruled on the motion to amend the judgment presided over the trial in which Hawatmeh and Nora asserted claims against UMD. (See *Jack Farenbaugh & Son v. Belmont Construction, Inc.* (1987) 194 Cal.App.3d 1023, 1030-1031.) There was no denial of due process.

26

DISPOSITION

The judgment is affirmed.  The postjudgment order adding Iehab Hawatmeh and Fadi Nora as additional judgment debtors is affirmed.  Respondents are entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KITCHING, Acting P. J.


LAVIN, J.[*]


---

[*]     Judge of the Los Angeles Superior Court, assigned by Chief Justice pursuant to article VI, section 6 of the California Constitution.